[No. 3554.]

### N. McRay *v.* The State.

MALICIOUS MISCHIEF.— Appellant was convicted of wilfully and wantonly killing a mare and a mule, the property of another, upon an indictment based upon article 680 of the Penal Code, which defines that specific offense. But the evidence shows that the animals were killed in an inclosure of cleared and cultivated land, which was in the appellant's charge. *Held*, that, if the appellant was guilty of any offense, it was of that defined in article 685 of the Penal Code, and not of that charged in the indictment. *Payne* v. *The State*, 17 Texas Ct. App., 40, referred to and approved upon this question.

APPEAL from the County Court of Bell. Tried below before the Hon. J. M. Rosborough, County Judge.

The appellant was tried alone and convicted upon an information that charged him, jointly with one Archie McFarland, with the offense of wilfully and wantonly killing a mare and a mule, the property of one J. C. Fulwiler, in Bell county, Texas, on the 31st day of October, 1883. A fine of $100 was the penalty assessed by the jury.

J. C. Fulwiler was the first witness for the State. He testified

that he lived in Bell county, Texas, and owned a drove of horses, mares and mules. Some time before the killing of the mare and mule in question, which occurred on the day alleged in the information, the defendant and Archie McFarland brought to the witness two of his animals, and complained that they had been breaking into their fields, and destroying their crops, and requested witness to restrain them. They told the witness that they thought if he would confine the gray mare, the others would not trouble them. Witness, after these complaints were made, told defendant and McFarland that in future, if they would advise him of all damage done them by his stock, he would indemnify them, and promised to restrain the gray mare, as requested. He had, according to his promise, kept the gray mare up. He never afterwards heard from defendant or McFarland in regard to incursions by stock upon their fields. Witness found one of his gray mares, and a black mule he owned, dead, upon the prairie, about three hundred yards distant from McFarland's house. Witness had three gray mares in his bunch. Witness lived distant from McFarland's, between two and three miles.

Wes. Pierson was the next witness for the State. He testified that he lived in Bell county, Texas. Between daylight and sunrise on the morning of the alleged offense, the witness and Nick Insell went to a spring not a great distance from McFarland's field. The farms of McFarland and J. S. Sellers were at that time under the same inclosure. Defendant at that time was making a crop on McFarland's farm. While at the spring witness and Insell saw three animals in that inclosure. They were on some stubble ground, about one hundred and fifty yards beyond the dividing line between Sellers and McFarland's cultivated ground, and on Sellers's land. Cotton and corn were growing on either side of the stubble. Presently they heard the report of a gun, and, looking in that direction, saw two men after the horses. These men each fired two shots at the horses, all of the shots being fired on Sellers's land. The larger man fired first, putting the horses to flight, and as they passed the smaller man he fired, causing the gray animal, which had traveled very rapidly up to that point, to diminish her speed. Witness remarked then that she would not be able to get out of the field. Witness was some four or five hundred yards from the parties who did the shooting. It was not then sufficiently light to enable the witness to dis- tinguish or recognize the parties, though he could see them well enough to notice that one wore a white and the other a black hat. These men, to the best of the witness's knowledge and belief, were

the defendant and Archie McFarland. Witness would not testify absolutely to their identity, but felt morally certain that they were the parties named. After the shooting the men with their guns went from the field to the fence, got over the fence, and passed under the railroad bridge, and thence on towards McFarland's house. Witness saw the parties no more after they passed under the railroad bridge. Witness was well acquainted with the defendant and McFarland, and while he could not distinguish the features of the men who shot at the horses, yet, judging from their sizes and general appearance, he took them, as stated, to be defendant and Archie McFarland.

Nick Insell's testimony, for the State, was substantially the same as that of Pierson. He was at too great a distance, and the early morning light was too dim, for him to completely recognize either of the parties who did the shooting, and while he would not swear positively that the defendant was one of them, he was satisfied in his own mind that he was. Describing the topography of the country, witness said that McFarland's field ran north and south; that McFarland's house was at the southwest corner of the field; that the railroad bridge crossed the branch at the northeast corner of the field; that both the field and house of McFarland were on the west side of the branch, and that the branch ran north and south. He further stated that if the parties had gone straight on after passing under the bridge they would have come in sight again, but they did not reappear.

Willie Sellers was the next witness for the State. He testified that when the animals described in the indictment were shot the field of the witness's father and that of McFarland were under the same inclosure, the dividing fence which once separated them having been destroyed and removed. The defendant in this case was making a crop on McFarland's land that year. About 7 o'clock on the morning of the alleged shooting the witness went into his father's field and found Fulwiler's gray mare in that field, and a mule on the outside. Witness let the fence down for the mare to pass out. The mare had been freshly shot through the neck, and was bleeding. Witness did not discover that the mule was wounded. Both the mare and the mule belonged to Fulwiler. Witness had often seen them on McFarland's ground. There was an ungathered crop of corn on McFarland's ground at the time the shooting was done, but nothing save wheat stubble on the land that belonged to the witness's father. The fence around the field was a worm fence, with spaces which at some points between the top rail and

the rider were large enough to admit the body of a horse, and let him get through.  At such places, the rider being thrown off, the fence would not be waist high.  A day or two after the shooting of the animals defendant came by witness's father's house, and said to his father, in the presence and hearing of the witness: " I am going off to make some money.  You need not be uneasy about those animals being shot on your land, for if there is any fuss about it, I will come in and acknowledge to my part of it, and pay up like a man."

J. L. Sellers testified, for the State, that his and McFarland's fields were in the same inclosure, without a dividing fence, at the time that these animals were shot.  That part of the fence on the east line of his side of the inclosure was about the most dilapidated of the entire fence, but witness had never known stock to break through at that point.  This witness corroborated his son as to the defendant's statement about his purpose of acknowledging his agency in the shooting, and paying, if the matter resulted in a controversy.

J. R. Chapman testified, for the State, that he examined the dead bodies of the two animals at the point on the prairie where they lay, some two or three hundred yards from the fields of McFarland and Sellers.  The wounds he found on both were sufficient to cause death.  The animals belonged to J. C. Fulwiler.

W. W. McFarland testified, for the defense, that he was the father of Archie McFarland.  The defendant on trial made a crop on witness's place in the year 1883, and was so engaged at the time of the alleged offense.  The effect of the testimony of this witness was that the fence around his field was a good fence, at least six feet high, and at no point in the condition described by two of the State's witnesses; that Fulwiler's stock of horses and mules, for a long time prior to the shooting, persistently invaded his field by breaking, and damaged his crops; that he repeatedly sent Fulwiler notice of this fact with a request to restrain his stock, particularly a certain gray mare and a certain dark colored mule; and finally witness sent his son Archie and the defendant to Fulwiler, to complain of the depredations of his stock; that Fulwiler did not, as requested, restrain his stock, but that they repeatedly afterwards broke into the witness's field; that the distance between the points indicated by Pierson and Insell as the point at which they stood on the morning of the shooting and the point they indicated as that of the two men who did the shooting, was a good eight hundred yards; that the branch near his house was a popular resort for duck-

hunters, and that about daylight on the morning of the alleged shooting of the animals, he heard several shots in the direction of the branch, and at the time supposed they were fired by duck-hunters. He described also the topography of the country, and asserted that one passing over the railroad bridge would not go in the direction of his house from the point of view claimed to have been occupied by Pierson and Insell, and that, while a dirt road which ran under the bridge led in the direction of his house, parties following that road could not be seen from the point occupied by Pierson and Insell, after passing under the bridge.

Frank Wofford was the next witness for the defense. The substance and effect of his testimony was to corroborate the witness W. W. McFarland as to the character of the fence inclosing the McFarland farm, declaring that fence to be a good one, and equal to any fence in the country. He often saw Fulwiler's horses and mules depredating upon McFarland's crops — had known them, including the mare and mule in question, to break into the field of McFarland, and had seen Archie McFarland driving them out.

The correctness of the charge of the court and the sufficiency of the evidence to sustain the conviction were assailed by the motion for new trial.

No brief for the appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. It is charged in the indictment that the defendant, jointly with another, wilfully and wantonly shot and killed a mare and a mule, the property of one Fulwiler. The indictment charges the offense defined by article 680 of the Penal Code, and of this offense the defendant was convicted. The evidence, however, shows conclusively that the animals were shot in an inclosure of cleared and cultivated land, which was at the time in charge of the defendant. In other words, the evidence shows that the particular offense committed by the defendant was that defined by article 685 of the Penal Code.

In *Payne* v. *The State*, 17 Texas Ct. App., 40, we held that under an indictment charging the offense defined in article 680, the defendant could not be convicted legally when the evidence proved that, if guilty of any offense, it was that defined by article 685. That decision we still believe to be correct, and it is decisive of this case; wherefore the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered June 3, 1885.]